UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-067 (WMW)

| | |
|---|---|
| UNITED STATES OF AMERICA,    )<br>                              )<br>         Plaintiff,           )<br>                              )<br>         v.                   )<br>                              )<br>                              )<br>TERRY J. ALBURY,              )<br>                              )<br>         Defendant.           )  | GOVERNMENT'S RESPONSE TO<br>DEFENSE POSITION WITH RESPECT<br>SENTENCING |

The United States Department of Justice, National Security Division, Counterintelligence and Export Control Section, and the Office of the United States Attorney for the Eastern District of Virginia (collectively, the "Government"), hereby submits its response to the defense position with respect to sentencing of Terry J. Albury ("Albury" or "defendant"). For the reasons described in the Government's opening Sentencing Position, and the reasons below, a sentence of 52 months of imprisonment is appropriate.

The defense spills much ink on the defendant's background and his purported "misgivings" (*e.g.*, Defense Position on Sentencing at 12), and his "increasingly troubled" and "deeply conflicted" beliefs. (*Id.* at 13). The defense even goes so far as to suggest that he felt "complicit in acts of torture." (*Id.* at 14). Not only is this uncorroborated and not able to be corroborated, but if even remotely true, he bore an absolute duty to report his concerns to the U.S. Department of Justice's Office of Inspector General, or to the independent Office of Special Counsel. He never attempted to make any such report. Moreover, despite this putative inner

turmoil, at the time of his employment with the FBI, the defendant appears to have gladly accepted (and now trumpets) any awards that he received.

To be sure, were the defendant truly troubled or disturbed or at odds with FBI policies or practices, he could have walked away.  He could have walked away at any time over the past 15 years—quietly or loudly, so long as he did not disclose classified or national defense information.  Ultimately, he chose instead to engage in criminal conduct for 18 months rather than engage any process to remedy the ills he perceived against others or felt against himself.

The defense's claims of good intent are wholly unbelievable given the facts of this case.  Moreover, the defendant's arguments about his motive are irrelevant, as courts have repeatedly held in cases charging violations of 18 U.S.C. § 793, and his guilty plea recognizes as much.  The defendant's arguments in this regard are wholly unavailing.

**The Guidelines and Abuse of Trust**

Nothing in the defense filing counters the analysis in the PSR or the Government's opening Sentencing Position with respect to the abuse of trust enhancement.  As previously explained, the plain language of the relevant statute and related statutes encompass behaviors of not only government insiders, national security clearance holders, and contractors, but also ordinary citizens and foreigners.  It may well be more difficult to prove criminal conduct—that is, willful, knowing behavior—by someone who does not hold a national security clearance, and there may be fewer such cases under this particular statute as a result, but Congress wrote the statute broadly enough to encompass a wide range of individuals.  The associated guidelines reflect the various levels of intent associated with the relevant statutes.[1]  The fact that Albury

---

[1] It is also worth clearing up a misnomer from the defense and amici.  While they seem keen to refer to "The Espionage Act of 1917," calling on some sense of unwarranted statutory ageism, that Act (which itself supplanted a 1911 statute) was separated into § 793 (Gathering, transmitting or losing defense information) and § 794 (Gathering or delivering defense information to aid a foreign government) following World War II.  A third relevant statute, 18

could arrive at work early and work with classified materials while no one else was around demonstrates quite plainly that he occupied a position of trust. So too, the fact that he did so precisely because it gave him an opportunity to illegally photograph or otherwise steal documents from his FBI classified computers demonstrates his abuse of that trust. *United States v. Pitts*, 176 F.3d 239, 246 (4th Cir. 1999) (upholding upward departure of an additional point *beyond* the 2-level enhancement for abuse of position of trust in espionage case involving FBI agent); *see United States v. Ford*, 288 F. App'x 54, 60-61 (4th Cir. 2008) (affirming enhancement against NSA employee who held clearance). Here, the defendant's behavior put his colleagues at risk, put their work at risk, and put the public at risk. Thus, the enhancement is appropriate. *See United States v. Bartsh*, 985 F.2d 930, 935 (8th Cir. 1993) (affirming upward departure beyond abuse of position of trust enhancement because bankruptcy trustee's fraud victimized the very individuals he was supposed to aid); *United States v. Siciliano*, 953 F.2d 939, 942-43 (5th Cir. 1992) (affirming two-point enhancement and additional enhancement because guard's abuse of trust implicated security of prison he was charged with protecting).

The defense assertion that the guideline does not take into account the behavior of those who make unauthorized disclosures but are not spies simply ignores the remainder of the statutory scheme and the attendant guidelines. U.S.S.G. § 2M3.1 is the guideline that applies to actual espionage. That section provides a base level of 42 for disclosure of Top Secret level information and 37 for other information. There is a substantial guideline drop between an espionage charge pursuant to § 794 and an unlawful transmission charge under § 793, where, for

---

U.S.C. § 798 (Disclosure of classified information) was enacted in 1951 to address disclosures of communications intelligence, and these statutes were revisited by Congress in the 1980s and 90s. As recently as last year, Congress amended 18 U.S.C. § 1924 to make the knowing unlawful removal and retention of classified materials a felony. To assert that § 793 was designed solely to prosecute World War I "spies" dims history and does violence to the plain language of the statute.

the latter, the guidelines are 29 for Top Secret information and 24 for other information. That means that an actual spy is facing 30 years to life for a base offense level if Top Secret information is involved, or approximately 20 years if the information is not Top Secret. In contrast, a conviction under § 793 yields a base sentence of 87-108 months for Top Secret information and four to five years otherwise. The guidelines thus provide essentially a 15-20-year difference in their base calculations for actual espionage versus the type of activity charged in this case.

This reflects the intent levels required in the respective statutes, as § 794 requires proof of "intent or reason to believe that [the national defense information] is to be used to the injury of the United States or to the advantage of a foreign nation," whereas § 793(e) requires "willful" communication of materials relating to the national defense, and proof of "reason to believe" that a willful communication of information "could be used to the injury of the United States or to the advantage of any foreign nation." Moreover, that straightforward analysis completely refutes the defense theory of the guidelines and exposes their misleading usage of the term "Espionage Act." But the guidelines are even more thoughtful and calculated, as there is another guideline – § 2M3.2 – that captures crimes that fall in between. That guideline splits the difference between the base levels of § 2M3.1 and § 2M3.3, providing a base offense level of 35 for Top Secret information and 30 for other information. This guideline applies in situations where the level of intent is higher (a "reason to believe" standard, as is necessary to prove a § 793(e) charge relating to intangible information rather than documents) than in a pure disclosure of documents case. *See* § 2M3.2 Commentary Background (noting that the relevant statutes "proscribe diverse forms of obtaining and transmitting national defense information with intent or reason to believe

the information would injure the United States or be used to the advantage of a foreign government").

**Defendant's Conduct**

The defense repeatedly (and wrongly) describes Mr. Albury as a "whistleblower," (Defense Pos. at 25-27, 40, 43, 46), but the defense itself has never claimed that he brought any waste, fraud, or abuse to light to anyone; rather, it claims that he made disclosures on "matters of public interest," in areas where the FBI "had long been" criticized. (PSR ¶ 17). The defense tries repeatedly to have it both ways in its filing – the defendant was miserable and hated working at the FBI but never sought to leave; the defendant disagreed with FBI policies, but said and did nothing to try to change those policies and accepted awards for conduct in accordance with those policies (Defense Pos. at 15-16, 21-22); the defendant had great ideas (Defense Pos. at 22-23), but he never shared them;[2] the defendant believed he saw abuses at the FBI and indeed now alleges criminal behavior while in Iraq (Defense Pos. at 14-15), but at the time, said nothing and made no referrals, anonymous, informal, or otherwise (*Id.*); the defendant's behavior in

---

[2] Defendant's draft "white paper" does not help him here. To be sure, many of the views expressed are consistent with FBI principles, as the FBI has long recognized that "[f]or the FBI to successfully conduct investigations and protect the American people from crime and acts of extremism, it must have the support and understanding of the people it serves." https://www.fbi.gov/contact-us/field-offices/buffalo/news/press-releases/fbi-directors-community-leadership-award-2014; *see* https://www.fbi.gov/video-repository/newss-fbi-honors-community-leaders/view (2008 community leadership award ceremony ); https://www.fbi.gov/file-repository/stats-services-publications-fbi_ct_911com_0404.pdf/view at 63-64 (noting revision of training program relating to source development in the wake of 9/11).

Nor could his "white paper" have made an impact in any event, as he did not complete it or share his thoughts with his organization. If the defendant were actually serious about developing this embryonic project, he certainly could have done so. The ideas he describes in his draft are well-recognized elements of good community policing. He could have created a work product for the FBI that incorporated classified materials with which he agreed and disagreed. He also could have sought to publish something that incorporated unclassified elements of those materials, or sought their declassification or the use of an adequate substitute for creating a public work. Instead, he chose to repeatedly betray his oath to the nation and violate the law.

committing his crimes was admirable (Defense Pos. at 49), but somehow also aberrant (Defense Pos. at 51). Any contention of whistleblowing fails on its own terms.

To be sure, the defendant pled guilty to disclosing "national defense information." The phrase "information relating to the national defense" is not defined in 18 U.S.C. §§ 793 or 794. The Supreme Court considered the term "information relating to the national defense" in *Gorin v. United States*, 312 U.S. 19, 28 (1941), defining it as "a generic concept of broad connotations, referring to the military and naval establishments and related activities of national preparedness." Federal courts have consistently cited *Gorin* in their interpretations of the various subsections of §§ 793 and 794. *See, e.g., United States v. Squillacote*, 221 F.3d 542, 576-77 (4th Cir. 2000); *United States v. Morison*, 844 F.2d 1057, 1073 (4th Cir. 1988). "Congress intended 'national defense' to encompass a broad range of information and rejected attempts to narrow the reach of the statutory language." *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 (4th Cir. 1980) (citing Harold Edgar & Benno C. Schmidt, Jr., The Espionage Statutes and Publication of Defense Information, 73 Colum. L. Rev. 929, 972-74 (1973)).

In connection with his plea, the defendant agreed that the information disclosed "related to the national defense."[3] The facts here do not indicate the defendant was a whistleblower, and indeed, the facts of this case are inconsistent with the defendant's arguments. The first document charged relates generally to recruitment of confidential human sources. It does not reference minority groups, contrary to the defense's narrative. The second document relates to specific

---

[3] Here, the parties did not resolve the matter with an 11(c)(1)(C) specific number or range for sentencing, but are relying on the Sentencing Guidelines and 3553 factors in presenting our sentencing positions to the Court. Those cases with specifically negotiated resolutions all demonstrate the government taking a substantial discount from the guideline calculation in return for the certainty of not confirming existing classified materials and exposing additional information in court. That risk was lessened in this case because not only was the evidence of guilt overwhelming, but the sheer volume of material that the defendant took from the FBI and unlawfully disclosed or retained presented the Government with more options for a trial presentation.

intelligence about threats from a particular group. Neither of these documents illustrates or relates to abuse, let alone the type of abuse the defense describes.

The defense cannot shoehorn its whistleblower argument into the facts relating to the retention element of these crimes. The charged retention document relates to the online recruitment efforts of a terrorist organization. The defense asserts that Albury photographed materials "to the extent they impacted domestic counter-terrorism policy." (Defense Pos. at 37). This, however, ignores the fact that he also took documents relating to global counterintelligence threats and force protection, as well as many documents that implicated particularly sensitive Foreign Intelligence Surveillance Act collection. The retention of these materials is particularly egregious because Albury's pattern of behavior indicates that had the FBI not disrupted Albury and the threat he posed to our country's safety and national security, his actions would have placed those materials in the public domain for consumption by anyone, foreign or domestic.

Moreover, the defendant's motive in committing the charged crime is irrelevant, as courts have repeatedly held in § 793 cases. *See, e.g., United States v. Kiriakou*, 898 F. Supp. 2d 921, 926-27 (denying defendant's requests for discovery that would support a good faith defense "because any claim that he acted with a salutary motive, or that he acted without a subversive motive, when he allegedly communicated NDI to journalists is not relevant to this case"). Even if the defendant's proffered motive were true, that would not change the illegality of what the defendant did. *See United States v. Pomponio*, 429 U.S. 10, 12 (1976) (rejecting the idea that willfulness requires proof "of any motive other than intentional violation of a known legal duty"); *United States v. Edwards*, 101 F.3d 17, 19 (2d Cir. 1996) (finding that the defense "assumption that good motive for committing a crime is inconsistent with criminal intent" was erroneous); *United States v. Dack*, 987 F.3d. 1282, 1285 (7th Cir. 1993) (holding that "protesting

government policies is not a defense even if such protest is based on a good motive"); *United States v. Martin*, No. 1:17-cr-00069, Dkt. 94 at n.4 (D. Md. 2018) (recognizing that "underlying motive is irrelevant") (quoting *United States v. Morison*, 622 F. Supp. 1009, 1010 (D. Md. 1985)). It also would not change the need to deter other individuals from committing similar crimes that endanger our country or the other purposes behind sentencing.

Further, the defense's attempts to minimize this behavior is disappointing. The "secret location in his home known only to himself" where the defendant hid the storage device (the one with Reporter A's telephone number affixed to it) was a shirt pocket in his closet. He did, as the defense claims, "recover and retain [the materials] in a manner to erase data that could identify him" (Defense Pos. at 37), but there would be no reason to do so if he were merely intending to store them in his secret shirt pocket in perpetuity. The fact that they were in his house specifically ties the documents to him, particularly when coupled with the FBI's forensic analysis of his computer activity at work. The only reason for Albury to engage in all of this anonymizing, deceptive behavior would be to continue his criminal scheme.

In its next breath, the defense broadcasts that Albury "took full responsibility for his actions." (Defense Pos. at 37). While it is true that Albury has accepted responsibility for the statutory elements of his crimes of conviction, and further true that his timely plea spared the government[4] additional time and potential loss of information in trying this matter, the manner in which the defense continues to pretend that the unlawful retention crime is unrelated to the unlawful transmission crime is as troubling as it is illogical.

---

[4] The defendant's "swift resolution of the case" (Defense Pos. at 48) redounded to his benefit as well as that of the government. He was spared the time and expense of an embarrassing public criminal trial that would broadcast in detail his wrongdoing, and he is receiving a three-level credit under the guidelines resulting in a 6-15 month reduction of his calculated sentencing range.

**Need for Deterrence**

With respect to deterrence, the Government notes that, regardless of having lost his sensitive national security clearance, the defendant remains under an obligation not to disclose classified information. While he has been cooperative during this process, a deterrent message must be sent not only to him but to others who are entrusted with protecting our nation's secrets.

The defense also notes that the government's investigation lasted six months. It is abundantly true that the government conducted a thorough investigation because it wanted to find the correct criminal. Leak investigations take time and resources, and here the FBI did everything it could to try to rule out the defendant as the source of the leaks precisely because he was a trusted insider. It was a sad day for the U.S. Department of Justice when we had to charge and expel one of our own.

**CONCLUSION**

This case is not about race. Nor is it about blowing any whistles. It is most certainly not about moral injuries. What it is about is the unlawful transmission and retention of classified national defense information by someone who fully understood how wrong his conduct was. The defendant has pled guilty to serious crimes. His criminal behavior lasted 18 months and only stopped when his co-workers at the FBI developed evidence demonstrating that one of their

own was betraying the very oath he swore to protect. A 52-month sentence at the midpoint of the guideline range is appropriate.

Dated: October 8, 2018                                   Respectfully Submitted,

| | |
|---|---|
| JOHN C. DEMERS | JEFFERSON B. SESSIONS III |
| Assistant Attorney General | United States Attorney General |
| for National Security | |
| Attorney for the United States, | G. ZACHARY TERWILLIGER |
| Acting Under Authority Conferred | United States Attorney for |
| by 28 U.S.C. § 515 | The Eastern District of Virginia |

             S/Patrick T. Murphy
By:     __S/David C. Recker_____          S/ Danya E. Atiyeh_
        Patrick T. Murphy                    Danya E. Atiyeh
        Bar No. 2750602 (NY)                 Bar No. 81821 (VA)
        David C. Recker                      Assistant United States Attorney
        Bar No. 0281189 (MN)                 Special Assistant to the Attorney General
        Trial Attorneys                      Eastern District of Virginia
        National Security Division           2100 Jamieson Ave.
        950 Pennsylvania Ave. NW             Alexandria, VA 22314
        Washington, DC 20530                 Danya.Atiyeh@usdoj.gov
        Patrick.Murphy@usdoj.gov             (703) 299-3700
        David.Recker@usdoj.gov
        (202) 233-0986