UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

U.S.A.,

       -against-                                                     18 CR 67 (WMW)

TERRY J. ALBURY,

            Defendant.


REPLY SENTENCING BRIEF
ON BEHALF OF TERRY J. ALBURY

JaneAnne Murray, Esq.
Minnesota Bar #: 0384887
Murray Law LLC
310 South Fourth Avenue, Suite 5010
Minneapolis, MN 55415
Tel:  (612) 339-5160
Fax: (866) 259-7819
Email: jm@mlawllc.com

Joshua Dratel, Esq.
New York State Bar #: 1795954
Law Offices of Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212) 732-0707
Fax: (212) 571-3792
Email: jdratel@joshuadratel.com

**Introduction**

This Reply Memorandum is submitted on behalf of defendant Terry Albury in connection with his sentencing, and responds to the government's October 4, 2018, Position With Respect to Sentencing (hereinafter "Gov't Position").

Much of the government's submission is dedicated to a repetition of Mr. Albury's offense conduct, which he has readily admitted. Particular contentions by the government, however, are without merit and require a response – *i.e.*, contrary to the government's claims, Mr. Albury's motivation for his offense conduct, while not relevant to guilt, is quite relevant at sentencing; the disclosures Mr. Albury made have not adversely affected U.S. national security and were valuable to the public discourse; the two-point abuse of trust enhancement in U.S.S.G. §3B1.3 does not apply herein given the particular facts in this case and the history of espionage cases; this case is not an appropriate vehicle for general deterrence; and certain other cases cited by the government are distinguishable.

> A. As the Government's Position Paper Concedes, Mr. Albury Did Not Harm U.S. National Security

The Gov't Position effectively acknowledges precisely what we have maintained throughout our representation of Mr. Albury: that his disclosures have not caused actual harm to the United States. No actual investigation has been put at risk; no undercover agent or source exposed or put in danger; no specific community or diplomatic relationship compromised. Rather, the worst the government can say about the impact of Mr. Albury's conduct is to describe "the harms that *could result* from the defendant's actions." Gov't. Position at 3 (emphasis added).

Indeed, the declaration of E.W. Priestap, Assistant Director of the FBI's Counterintelligence Division, accompanying the Gov't Position ("Priestap Dec.") fails to

articulate any actual harm caused by Mr. Albury, but rather carefully couches all possible harms in conditional and/or highly conclusory terms. *See, e.g.*, Priestap Dec. ¶ 11 (Albury's disclosures "*may erode* the FBI's ability to collaborate with various public and private entities in conduct ing counterterrorism and intelligence operations in support of U.S. national security"); *id.* ("unauthorized disclosures will continue to impose an increased cost to FBI operations *as the FBI works to adjust to the changing operating environment*"); *id.* ¶ 16 (Albury's undisclosed documents "*could* cause serious damage to the national security") (emphasis added).

It bears noting that were *Daubert* to apply to the sentencing context, Mr. Priestap's declaration would not pass muster under its regime. As the Supreme Court held in *Kumho Tire Co. v. Carmichael*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" 526 U.S. 137, 157 (1999) (*quoting General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Mr. Priestap's declaration is classic *ipse dixit* (defined in Merriam-Websster as "he himself said it" or "an assertion made but not proved" and in the Oxford English Dictionary to mean "an unproven assertion resting on the bare authority of some speaker"). As Priestap explains: "I assess whether the disclosure of in formation, at any given time, may lead to an unacceptable risk of compromising the FBl's ongoing intelligence-gathering process with respect to a particular investigation or investigations, and whether it may lead to an unacceptable risk of compromising certain investigative sources, methods, or techniques." Priestap Dec. ¶ 7. Essentially, Mr. Priestap decides if something is classified. It is classified if disclosure, in Priestap's view, creates a risk of compromising an investigation or investigative

mechanism.  If something is classified, then, *ipse dixit*, a risk of compromise exists.  *Cf.* Scholars Brief at 7 (noting findings of widespread classification of information the government has no basis to conceal).

That Mr. Albury's conduct caused no actual, specific harm to national security is hardly surprising.  Mr. Albury engaged in his whistleblowing activities deliberatively and surgically. His goal was to expose abuses and counter-productive strategies in the FBI's counter-terrorism initiatives (including biases and poorly-researched or understood preconceptions that informed these initiatives), and as a seasoned FBI agent, he knew how to do this without putting individuals in danger or compromising any specific investigations.  Moreover, he carefully curated his disclosures to the media.

In addition, the issues exposed by Mr. Albury were already largely in the public domain, and the subject of controversy.[1]  This is amply illustrated in the context of recruitment of Confidential Human Sources (CHS's), which Mr. Priestap describes as "vital to the FBI's ability to detect, investigate, and neutralize national security threats" and "a unique and critical FBI capability."  Priestap Dec. ¶ 12.  The Somali community in Minneapolis has long known of and distrusted the FBI's efforts to recruit CHS's -- or spies -- from within.[2]

---

[1]  The FBI's informant recruitment program has long been problematic.  *See* U.S. Dep't of Justice, Office of the Inspector Gen., *The FBI's Compliance With the Attorney General's Investigative Guidelines* 34, (Sept. 2005), available at https://oig.justice.gov/special/0509/final.pdf.

[2] For example, Jaylani Hussein, executive director of the Council on American-Islamic Relations' Minnesota chapter,

> told *The Intercept* that the FBI and other law enforcement agencies have been doing "a great deal of profiling of our community," visiting people at home and subjecting them to unwarranted harassment.  In 2015, the Brennan Center warned that the FBI's community outreach initiatives in Minneapolis had morphed into intelligence-gathering efforts. A year later, a manager with the Transportation Security Administration in Minneapolis reported being ordered by a supervisor to profile Somali imams and community members.

*See* Alice Speri, "*The FBI's Race Problems are Getting Worse.  The Prosecution of Terry Albury is Proof*," The Intercept, April 21, 2018, available at https://theintercept.com/2018/04/21/terry-albury-fbi-race-whistleblowing/.

For example, in one instance in 2016, a 26 year-old Somali-American video-recorded his encounter with two agents who came to the door of his apartment without a warrant a few days prior to a forum the individual was organizing to discuss the government-sponsored Countering Violent Extremism (CVE) programs.[3]  The individual refused to open the door, and refused to speak to the agents without an attorney present.  The agents persisted in trying to interview him, at one point saying "you could just make this easier or make this hard."[4]  The individual finally asked them that "next time," would they kindly "announce [them]selves" (since these agents had simply arrived at his apartment door).[5]  He noted that it's "kind of scary to have two white guys coming through the neighborhood looking for people."[6]  One of the agents questioning him was Terry Albury.[7]

---

[3] Joseph Sabroski, *Video of FBI Visit of Muslim Activist Highlights Disturbing Nature of Federal Counter-Extremism Programs*, Alternet, August 28, 2016, available at https://www.alternet.org/grayzone-project/video-fbi-visit-muslim-activist-highlights-disturbing-nature-federal-counter.

[4] *Id.* (including embedded video).

[5] *Id.*

[6] *Id.*

[7] *Id.*  Several newspaper articles and reports predating Mr. Albury's disclosures document the specifics of the FBI's CHS program.  *See, e.g.*, Craig Phillips, *A Former FBI Agent Talks About Handling Informants*, PBS, February 18, 2016, available at http://www.pbs.org/independentlens/blog/a-former-fbi-agent-talks-about-handling-informants/; Maura Dolan, *Can FBI be held liable for targeting Irvine Muslims for surveillance?*, LA Times, December 21, 2015, available at http://www.latimes.com/local/orangecounty/la-me-muslim-fbi-20151221-story.html; Arun Kundnani et al., *How One Man Refused to Spy on Fellow Muslims for the FBI—and Then Lost Everything*, The Nation, October 14, 2014, available at https://www.thenation.com/article/how-one-man-refused-spy-fellow-muslims-fbi-and-then-lost-everything/; Chris McGreal, *Portland man: I Was Tortured in UAE for Refusing to Become an FBI Informant*, The Guardian, March 16, 2015, available at https://www.theguardian.com/us-news/2015/mar/16/portland-man-tortured-uae-behest-of-fbi; John Glionna, U.S. Muslim Leaders say FBI Pressuring People to Become Informants, LA Times, November 3, 2014, available at http://www.latimes.com/nation/la-na-muslims-fbi-20141103-story.html; Cynthia Dizikes and Todd Lighty, *Probationer Says He was Pressured to Be FBI Informant*, Chicago Tribune, September 24, 2014, available at http://www.chicagotribune.com/news/ct-probation-informant-met-20140904-story.html; Nick Bauman, *This American Refused to Become an FBI Informant. Then the Government Made His Family's Life Hell*, Mother Jones, May/June 2014, available at https://www.motherjones.com/politics/2014/05/sudan-fbi-informant-naji-mansour-terrorism/; Alex Kane, *You Might Get Hit By a Car": The Chilling Threats Used to Force Muslims Into Becoming Informants*, AtlerNet, May 13, 2014, available at https://www.alternet.org/civil-liberties/you-might-get-hit-car-chilling-threats-used-force-muslims-becoming-informants; Paul Harris, *The Ex-FBI Informant with a Change of Heart: "There is no Real Hunt. It's Fixed"* The Guardian, March 20, 2012, available at https://www.theguardian.com/world/2012/mar/20/fbi-informant; Elliott McLaughlin, *FBI Planting Spies in U.S. Mosques, Muslim Groups Say*, CNN, March 20, 2009, available at http://www.cnn.com/2009/US/03/20/fbi.muslim.groups/; Daniel Engbar, *How Do You Handle an FBI Informant*, Slate, September 13, 2005, available at  https://slate.com/news-and-politics/2005/09/how-do-you-handle-an-fbi-informant.html.

This was an every-day encounter for Mr. Albury.  He comported himself in this setting as a model FBI agent.  But the conflict and depression generated by these routine but soul-destroying events took its toll.

Moreover, it has been reported that "[m]embers of Minneapolis's large Somali community . . . [stated] that the documents Albury was accused of leaking helped shed light on the profiling and harassment many in that community regularly experience at the hands of the FBI, and said that they were grateful for the former agent's courage in making them public." *Id*.  Thus, for many in that community, the disclosures were "more than justified."  *Id*.[8]

Jaylani Hussein, executive director of the Council on American-Islamic Relations' Minnesota chapter, commented that "[c]ommunities of color have been calling for law enforcement officials to call out these type of practices[,]" and that they "commend [Mr. Albury] for his bravery in challenging institutions that need a great deal of reform to better serve the community that they serve."  *Id*.  That sentiment was echoed by Burhan Israfael Isaaq, a Somali community organizer in Minneapolis:  "I think [Mr. Albury] did a great service to the citizens of this country and especially to the people who are vulnerable to harassment from the FBI. . . . More power to him.  People are definitely grateful."  *Id*.

B.     Mr. Albury Did Not Intend to Cause Harm to U.S. National Security; Protection of the U.S. Was His Goal, and, Contrary to the Government's Claim, Motive is Highly Relevant to Sentencing

Moreover, not only did Mr. Albury not cause any harm to U.S. National Security, he did not intend to cause such harm.  *See also* Albury Position, at 49-50.  The government responds with two arguments.  While the government is correct that Mr. Albury's "motive is irrelevant to the offenses" as a matter of criminal liability, *see* Gov't Position, at 11, his motivation is unquestionably relevant to *sentencing*.  As set forth in Albury Position, at 49,

---

[8] *FBI's Race Problems, supra.*

courts have long acknowledged that a defendant's motive bears directly on a defendant's culpability for sentencing purposes. *See Solem v. Helm*, 463 U.S. 277, 293 (1983) (sentencing court "of course, is entitled to look at a defendant's motive in committing a crime").

In the alternative, the government disputes that Mr. Albury's behavior constitutes "the actions of one motivated by social conscience," Gov't Position at 11, citing the fact that Mr. Albury had 50 additional undisclosed documents at his home. The government's argument is a non-sequitur. That Mr. Albury acted in a whistleblower capacity is beyond peradventure. As the government concedes, he disclosed a set of documents *to a reporter*.

Also, since Mr. Albury incontrovertibly did not make the disclosures for professional or financial gain, or for any personal advancement, his single motive is manifest: in the public interest. It is also readily apparent from the nature of the documents disclosed that Mr. Albury engaged in his whistleblowing activities to highlight perceived abuses in the FBI's counter-terrorism strategies, in particular with respect to the recruitment of spies within minority communities. The government may not agree with Mr. Albury's assessment of the FBI's activities or with the manner he chose to publicize his cause, but its claim that Mr. Albury was not acting out of conscience is insupportable; in fact, it is contradicted by all the evidence.

A recent law review article by an attorney who works with immigrant communities reinforces Mr. Albury's public interest motivation, and the conclusion that his disclosures have been valuable to the public discourse on counterterrorism policy, including the targeting of immigrants' travel and leveraging immigration status in order to recruit informants through coercion and intimidation:

> [d]espite the widespread, regular prodding of information from
> Muslim-Americans about their daily life, there has not been

> any attempt to frame this as informant recruitment that deserves critical attention, procedural safeguards, or oversight. Nor has there been much scholarly or political scrutiny of the methods through which the FBI populates its expansive—and expanding—registry of informants with individuals who have the linguistic, cultural, and religious knowledge that would enable them to be effectively used to gather information about the daily life of Muslim-American populations.[9]

The government also mischaracterizes Mr. Albury's statement of acceptance of responsibility, accusing him of "ignoring his previous behavior and imputing culpability to others when he himself transmitted classified information to Reporter A." Gov't Position, at 11. Again, the evidence refutes that claim.[10]

Mr. Albury has unequivocally accepted *sole* and complete responsibility for his actions - acknowledging in full the removal and retention of classified documents from his office, the provision of documents to a reporter, the use of technology to remove identifying data, and the storage of additional documents at his residence that he had not disclosed to any reporter. He highlighted the manner in which he had stored these additional documents for the sole purpose of accepting that he had created a risk that these documents would be disclosed to a reporter without curation. That Mr. Albury was somehow attempting to shift blame to someone else by making this acknowledgement is entirely without merit.

Moreover, the government's arguments ignore the fact that, as set forth in Albury Position, at 50-51, Mr. Albury firmly believed, for good and demonstrable reason, that internal reporting within the FBI would have been futile, and even counterproductive, as it would have

---

[9] Diala Shamas, *A Nation of Informants: Reining In Post-9/11 Coercion of Intelligence Informants*, Brooklyn L. Rev., Volume 83, Issue 4, Article 1, 1175, 1179, 1189, 1991 (July 20, 2018) (footnote omitted), available at https://brooklynworks.brooklaw.edu/cgi/viewcontent.cgi?article=2149&context=blr. *See also id.*, at 1184 ("[p]erspectives from community-based groups and organizations, as well as attorneys working with these communities, along with information gleaned through litigation or leaked documents all suggest that there is a broader informant recruitment effort underway among Muslim communities in the United States").

[10] The government also errs in conflating acceptance of responsibility with motivation that can present mitigating circumstances. *See United States v. Singh*, 877 F.3d 107, 119-20 (2d Cir. 2017) ("[a] defendant's acceptance of responsibility and his assertion of mitigating circumstances are not necessarily inconsistent or incompatible."

generated retaliation and ostracism.  Indeed, he initially composed the White Paper discussed

in Albury Position, at 22-23, but abandoned that project in light of the resistance to change and

tolerance he witnessed from within.  (Mr. Albury's "White Paper" was provided by the

government in response to a sentencing discovery request.  We understand that it was retrieved

from his personal office computer or from his FBI document account.)

Were there other avenues open to Mr. Albury?  Could he have adopted another route

for conscientious objection?  Perhaps so.[11]  But must he serve prison time because of his

perception of the viability of those various options?

C.      The Abuse of Trust Enhancement Is Inapplicable When Analyzed in the
        Context of *Mr. Albury's Specific Conduct* and *Specific Offenses of Conviction*

As set forth in Albury Position, at 40-47, the two-point enhancement in §3B1.3 of the

Guidelines does not apply to him in this case for several reasons.  Nor do the government's

arguments alter that conclusion.

For instance, the government's references to abuse of trust enhancements in the context

of other guidelines and other statutes and hypothetical defendants constitute a red herring.  It is

axiomatic that under the Sentencing Guidelines, whether a specific offense characteristic

applies is a fact-specific analysis, individual to each particular defendant.

Nor does it inform the analysis if a violator of a different statute covered by the same

*general* Guideline could do so without possessing a security clearance.  Thus, the

government's assertion – unaccompanied by citation any authority – that "[n]owhere, in all of

the associated statutes and guidelines, is there an indication that only an individual occupying a

position of trust can violate them[,]" Gov't Position, at 9, is not the standard, and therefore

does not provide guidance here.

---

[11] *But see* authorities cited in Albury Position at 23-27.

Critical in the context of §3B1.3's two-level abuse of trust enhancement is that the abuse of trust is not "already included in the base offense level or specific offense characteristics." U.S.S.G. § 3B1.3. The enhancement is not added merely because the defendant held a position of trust. As the Eighth Circuit explained in *United States v. Claymore*, 978 F.2d 421 (8th Cir. 1992), "[i]f an abuse of trust is so central to the crime that the abuse would be included in the base offense level, the increase under § 3B1.1 is not available." *Id.* at 423.

In Mr. Albury's case, his position of trust was central to his crime in three respects, and as such, *in the context of his particular case*, it is already included in his base offense level.

First, his position of trust, through his security clearance, granted him access to classified material. *See Claymore*, 978 F.2d at 434 (two points for abuse of trust should not be added "if the defendant's position is one of a specialized nature *not merely giving him access to commit the crime*") (emphasis added).

Second, it is central to the finding that his handling of classified information was "unauthorized," as required under 18 U.S.C. § 793(e). As Mr. Albury's factual allocution acknowledged, it was only his security clearance that granted him access to sensitive and classified material. Plea Agreement, ¶ 2(e). What made Mr. Albury's actions "unauthorized" was his misuse of that trust placed in him by virtue of the security clearance.

Third, Mr. Albury's position of trust was critical to a finding that his conduct was knowing and willful. Again, as the factual allocution makes clear, it is the abuse of his position of trust as an FBI agent – his handling of documents contrary to the training he received about his security clearance – which forms the basis of the *mens rea* element of his convictions.

In sum, punishing Mr. Albury by adding a two-point enhancement for abuse of trust, when the abuse of trust is essential to all aspects of his offense, would penalize him twice for the same conduct. *See Waldner*, 580 F.3d at 707 (error if "precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways").

Even pursuant to the categorical approach advocated by the government, the appropriate frame of reference, given the relative novelty of recent Espionage Act prosecutions, is the application of the abuse of trust enhancement solely with respect to the category of government whistleblowers. In determining the appropriate guideline for Mr. Albury's case, grouping him with the spies and foreign agents traditionally prosecuted under the Espionage Act would be a patent affront to the requirement to treat like defendants alike, and avoid unwarranted conformity for defendants whose conduct is *dissimilar*. *See Gall v. United States*, 552 U.S. 38, 55 (2007).

It would place a publicly-minded whistleblower at the same ultimate offense level as a hostile foreign agent or U.S. intelligence agent selling classified information to a foreign power, thus exposing Mr. Albury to as steep a sentence as those malefactors.

Moreover, as pointed out in the Reporters' Brief, it would apply a Guideline to Mr. Albury that was formulated based on spy cases, and has not been ameliorated or reconsidered in light of the spate of recent whistleblower prosecutions. Reporters' Brief at 9 - 10. If, however, government whistleblowers are considered a category of defendants targeted under the Espionage Act, it is clear that their status necessarily encompasses the concept of a position of trust that was used contrary to regulation and law.

Such whistleblowers are prosecuted precisely because they violated their oaths, as the government emphasizes in its sentencing submission. *See*, Gov't Position, at 1, (Mr. Albury's

conduct "was not only against the law, *but a betrayal of the oath that the defendant took to protect classified information*;" "[a] significant sentence of incarceration is appropriate because individuals similarly situated to the defendant need to know that *anyone who breaks his or her oath to protect classified information will be punished accordingly*"). Adding an additional two points under U.S.S.G. § 3B1.3. when Mr. Albury's – like other whistleblowers' -- government status drove the prosecution in the first place would constitute impermissible double-counting.

Also, even if the Court were to impose the two-point enhancement, it is respectfully submitted that the specific facts of this case would provide the Court ample basis to discount it pursuant to the other relevant §3553(a) factors.

D.     The "Significant Sentence" the Government Seeks Will Not Achieve the Government's Goal of General Deterrence

The government seeks "[a] significant sentence of incarceration . . . because individuals similarly situated to the defendant need to know that anyone who breaks his or her oath to protect classified information will be punished accordingly."  Gov't Position at 14; *see also id.* at 15 ("a custodial sentence at the midpoint of the guideline range will promote respect for the law and afford adequate deterrence to similar criminal conduct in the future;" "a guideline sentence would communicate that the defendant's crimes will not be tolerated and would deter future crimes").

As outlined in Mr. Albury's initial sentencing submission, however, several factors subvert the general deterrence objective in this case.  First, as deterrence research emphasizes, the evidence in support of the deterrent effect of the *certainty of punishment* is far more consistent than that for the *severity of punishment*.[13]  But certainty of punishment is notably

---

[13] *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice 199, 202 (2013).

absent in the context of prosecutions of government employees for disclosures of classified information.

As established in Albury Position, at 57 – 63, the punishment imposed in any situation involving unauthorized disclosure is so completely inconsistent, arbitrary, and unpredictable – or if it is predictable, for all the wrong reasons (*i.e.*, the power of the person disclosing, the political advantage gained from disclosure, or the political exercise of the pardon authority) – that it is impossible for any particular case to provide the basis for general deterrence.  These glaring and irreconcilable inequities that currently attend the prosecution and punishment of unauthorized disclosures, as well as the confusion generated by the statements and actions (including pardons) by senior government officials, render this case an inappropriate vehicle for general deterrence. Also, general deterrence in the context of unauthorized disclosures of classified information is undermined by the classification process itself.  As *amici* point out, overclassification is rampant.  Scholars' Brief at 6.  Moreover, it is well-documented that "the government routinely classifies information that it has no legitimate basis to keep secret," sometimes "simply because disclosure would embarrass powerful officials or expose government misconduct."  *Id.*  The over-classification problem undermines the integrity of the classification system as a whole and breeds disrespect for it.[14]  This in turn weakens the deterrence effect of any punishment for unauthorized disclosures.

In addition, general deterrence often has little application in the context of individual acts of conscience, such as Mr. Albury's, which by their nature are driven by a deep-seated

---

[14] *See FBI's Race Problems, supra* (according to Michael German, a former FBI agent, the documents "should have never been withheld from the public in the first place[]" because "'[m]ost of them were FBI policy documents, and if we live in a democracy, we can't have secret government policies[.]'" *Id.* Mr. German also pointed that "[c]learly, having released them hasn't put our national survival at peril. All it has done is provide the public with more information about how the FBI conducts its business, and clearly there was evidence of abuse, particularly in a lot of the documents about targeting immigrants, targeting journalists").

belief in the importance of sacrificing for a higher good.  *See* Albury Position at 64 - 65.  For

that reason, while general deterrence has been an explicit element of some prior sentences for

unauthorized disclosure, such disclosures still occur because general deterrence cannot account

for a disclosure that a government employee feels compelled to make in the public interest.

Here, any general deterrence would be entirely speculative and inchoate,

unquantifiable, and unstandardized, making it impossible to determine how much would be

"sufficient, but not greater than necessary" to achieve any results.  *See also United States v.*

*Warner*, 792 F.3d 847, 861-62 (7th Cir. 2015)

Finally, and returning to the deterrence research cited earlier, to the extent deterrence

operates in this context, it operates based on apprehension and swift punishment, not severity

of punishment.[15]  Mr. Albury's punishment is already manifest severely.  He has lost his secure

and well-paid position.  He has lost the pension and health benefits guaranteed to him for life

upon just a few more years of service.  He has been convicted of a felony under the Espionage

Act.  His case has garnered international publicity.  Many brand him as a traitor.  The personal,

financial and emotional impact on his family has been extreme.  Imprisonment, we respectfully

submit, will do little to increase the deterrence effect of the litany of punishments to which Mr.

Albury has already been subject and will continue to be subject.  We also note that

imprisonment can be especially more onerous for former members of law enforcement.  *See*

*Koon v. United States*, 518 U.S. 81, 112 (1996) (district court could depart based on

susceptibility to abuse in prison given "extraordinary notoriety and national media coverage of

this case, coupled with the defendants' status as police officers").[16]

---

[15] *Id.*

[16] Danielle Ivory and Caitlin Dickerson, *Safety Concerns Grow as Inmates Are Guarded by Teachers and Secretaries*, *The New York Times*, June 17, 2018, available at https://www.nytimes.com/2018/06/17/us/prisons-safety-substitute-guards.html ("as the shortage of correctional officers has grown chronic under President Trump –

E.       The Sentences Citied by the Government Are Inapposite

The cases the government cites, in Gov't Position, at 15-16, are all distinguishable from
Mr. Albury's conduct and situation here.  For example, in *United States v. Winner*, (S.D. Ga.
1:17-cr-00034-JRH-BKE), in what prosecutors described as the longest sentence ever imposed
in federal court for an unauthorized release of government information to the media – 63
months pursuant to an agreed-upon sentence – the defendant, a contractor working at N.S.A.
for only five months, "caused exceptionally grave damage to U.S. national security," according
to government officials, by releasing information related to the U.S. intelligence agencies'
investigation into Russian hacking during the 2016 U.S. election campaign.[17]

Also, according to the Department of Justice's September 23, 2013, press release issued
in conjunction with the defendant's plea of guilty in *United States v. Sachtlaben*, (S.D. Ind.
1:13-cr-00200-WTL), in which the defendant also pleaded guilty to possessing child
pornography (as a result of a separate investigation, resulting in a separate consecutive
sentence), his "disclosure severely jeopardized national security and put lives at risk" because
it "threatened a sensitive intelligence operation and endangered lives by illegally disclosing
classified information relating to a disrupted al-Qaeda suicide bomb plot."[18]

In *United States v. Kiriakou*, (E.D. Va. 1:12-cr-00127-LMB), the defendant disclosed to
a reporter the name of a covert CIA officer as well as information revealing the role of another

---

and the practice of drawing upon other workers has become routine — many prisons have been operating in a
perpetual state of staffing turmoil, leaving some workers feeling ill-equipped and unsafe on the job, according to
interviews and internal documents from the Bureau of Prisons").

[17] *See* Dave Philipps, *Reality Winner, Former N.S.A.Translator, Gets More Than 5 Years in Leak of Russian
Hacking Repor*t, *The New York Times*, August 23, 2018, available at
https://www.nytimes.com/2018/08/23/us/reality-winner-nsa-sentence.html.  *See also* Charlie Savage and Alan
Blinder, "Reality Winner, N.S.A. Contractor Accused in Leak, Pleads Guilty," *The New York Times*, June 26,
2018, available at https://www.nytimes.com/2018/06/26/us/reality-winner-nsa-leak-guilty-plea.html.
[18] *See* U.S. *Department of Justice, Former Federal Contractor Petitions to Plead Guilty to Unlawfullly Disclosing
National Defense Information and Distributing Child Pornography*, available at
https://www.justice.gov/opa/pr/former-federal-contractor-petitions-plead-guilty-unlawfullly-disclosing-national-
defense.

CIA employee.  The defendant in *Kiriakou* also lied to the CIA about his book, claiming to a pre-publication review board that he had fictionalized certain passages when in fact they reflected actual classified activities and information.  Indeed, his disclosures to the reporter were inextricably intertwined with his commercial promotion of his memoir.[19]

In *United States v. Sterling*, (E.D. Va. 1:10-cr-00485-LMB), the government and sentencing court both stated that the defendant had caused particular damage by effectively revealing the identity of a man working with the CIA – with the Court stating there was "no more critical secret" than that — and that he deserved a harsher penalty than others recently accused of disclosing classified information because he had not pleaded guilty and admitted wrongdoing.[20]

Regarding *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988), as noted in Albury Position, at 46, the defendant therein was convicted of *selling* classified defense information to a magazine overseas.

In addition, in *United States v. Pho*, 1:17-cr-00631 (D. Md. 2018), the defendant took home from N.S.A. classified documents that were subsequently downloaded from his computer by Russian hackers using the antivirus software installed on his home computer.  The documents included information about U.S. intelligence hacking tools, and the documentation for such measures.  The government described the loss of the "massive troves" of information to a foreign power as "devastating for the intelligence community."[21]

---

[19] Pam Benson, *Former CIA Officer Accused of Leaking Classified Info*, CNN, January 23, 2012, available at http://security.blogs.cnn.com/2012/01/23/former-cia-officer-accused-of-disclosing-i-d-of-a-fellow-agent/

[20] Max Zapotosky, *Ex-CIA officer convicted in leak case sentenced to 3½ years in prison*, *The Washington Post*, May 11, 2015, available at https://www.washingtonpost.com/local/crime/ex-cia-officer-convicted-in-leak-case-sentenced-to-3-12-years-in-prison/2015/05/11/fc5427a6-f5a0-11e4-84a6-6d7c67c50db0_story.html?utm_term=.45dc09828eb9

[21] Scott Shane, *He Took Home Documents to Catch Up on Work at the N.S.A. He Got 5½ Years in Prison*, *The New York Times*, September 25, 2018, available at https://nyti.ms/2NOYYAs.

As reported in *The New York Times*, "Adm. Michael S. Rogers, then the N.S.A. director, wrote in an unusual letter to [the sentencing judge that the defendant's] breach of security rules had resulted in 'articulable harm to intelligence-gathering'" – an impact notably absent here.[22]

In its press release, the U.S. Department of Justice stated that the defendant's actions "compromised some of our country's most closely held types of intelligence, and forced NSA to abandon important initiatives to protect itself and its operational capabilities, at great economic and operational cost" – again an aspect decidedly not present in this case.[23]

In *United States v. Marshall*, (S.D. TX 1: 17-cr-1), the defendant downloaded "documents describing U.S. nuclear command, control and communications" onto a compact disk stored in his home(s), including one overseas.  He also shipped from overseas hard drives containing classified documents regarding "ground operations in Afghanistan."[24]

In *United States v. Mehalba*, 03-cr-10343-DPW (D. Ma. 2005), the defendant, a U.S. military interpreter, took classified information on a disk from Guantanamo and then lied to Customs agents about the contents of the disks.

As a result, these cases cited by the government do not provide guidance with respect to Mr. Albury's sentence other than to drive it downward dramatically by comparison.

---

[22] *Id*.
[23] U.S. Department of Justice, Office of Public Affairs, *Former NSA Employee Sentenced to Prison for Willful Retention of Classified National Defense Information*, September 25, 2018, available at https://www.justice.gov/opa/pr/former-nsa-employee-sentenced-prison-willful-retention-classified-national-defense.
[24] U.S. Department of Justice, *Former Defense Contractor Convicted of Unlawfully Retaining Classified Information*, March 5, 2018, available at https://www.justice.gov/opa/pr/former-defense-contractor-convicted-unlawfully-retaining-classified-information.

Conclusion

For all the foregoing reasons, the Court should depart and/or vary below the applicable

guideline, and sentence Mr. Albury to a non-custodial sentence.

Dated: October 8, 2018

Respectfully submitted,


/s/                                             /s/

JaneAnne Murray, Esq.                Joshua Dratel, Esq.
Minnesota Bar #: 0384887            New York State Bar #: 1795954
Murray Law LLC                        Law Offices of Joshua L. Dratel, P.C.
310 South Fourth Avenue, Suite 5010  29 Broadway, Suite 1412
Minneapolis, MN 55415                New York, NY 10006
Tel:  (612) 339-5160                 Tel: (212) 732-0707
Fax: (866) 259-7819                  Fax: (212) 571-3792
Email: jm@mlawllc.com                Email: jdratel@joshuadratel.com