1       UNITED STATES DISTRICT COURT
        DISTRICT OF MINNESOTA
2

3 ------------------------------------------------------------
             )
 United States of America,  ) File No. 18-CR-67
4            )     (WMW)
    Plaintiff,   )
5            )
 vs.         ) St. Paul, Minnesota
6            ) October 18, 2018
 Terry J. Albury,    ) 11:16 a.m.
7            )
    Defendant.   )
8 ------------------------------------------------------------

9


10


11   BEFORE THE HONORABLE WILHELMINA M. WRIGHT
     UNITED STATES DISTRICT COURT JUDGE
12


13

        **(SENTENCING HEARING)**
14


15


16


17


18


19


20


21


22


23


24

   Proceedings reported by shorthand reporter; transcript
25 produced by computer.

1    <u>APPEARANCES</u>

2       For the Plaintiff:      Department of Justice
                                National Security Division
3                               PATRICK T. MURPHY, ESQ.
                                DAVID C. RECKER, ESQ.
4                               950 Pennsylvania Ave
                                Washington, D.C. 20530
5
                                United States Attorney's Office
6                               DANYA E. ATIYEH, ESQ.
                                2100 Jamieson Avenue
7                               Alexandria, Virginia 22314

8       For the Defendant:      Law Offices of Joshua L. Dratel, PC
                                JOSHUA L. DRATEL, ESQ.
9                               Suite 1412
                                29 Broadway
10                              New York, New York 10006

11                              Murray Law, LLC
                                JANEANNE MURRAY, ESQ.
12                              Suite 5010
                                310 South Fourth Avenue
13                              Minneapolis, Minnesota 55415

14      Court Reporter:         LORI A. SIMPSON, RMR-CRR
                                Suite 146
15                              316 North Robert Street
                                St. Paul, Minnesota 55101
16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3        (Defendant present)

4              COURTROOM DEPUTY:  The matter before the Court is

5    18-CR-67, United States of America vs. Terry J. Albury.

6              Will counsel please stand and note your appearance

7    for the record.

8              MR. MURPHY:  Your Honor, Patrick Murphy for the

9    United States.  With me today are David Recker from the

10   National Security Division and Dana Atiyeh from -- an AUSA

11   from the Eastern District of Virginia.

12             THE COURT:  Thank you.  Good morning, Mr. Murphy.

13   And good morning, Mr. Recker and Ms. Atiyeh.

14             MR. DRATEL:  Good morning, Your Honor.  Joshua

15   Dratel with JaneAnne Murray for Mr. Albury, who is seated

16   between us.

17             THE COURT:  Thank you.  Good morning, Mr. Dratel,

18   as well as Mr. Albury and Ms. Murray.

19             So we are here for a sentencing in this matter.

20   Mr. Albury previously pleaded guilty to unauthorized

21   disclosure of national defense information and that's a

22   violation of Title 18, United States Code, Section 793(e).

23             Mr. Murphy, have you and your co-counsel received

24   a copy of the Presentence Investigation Report and the

25   addendum?

1          MR. DRATEL:  Yes, Your Honor.

2          THE COURT:  Okay.  And have you and your

3    co-counsel and Mr. Albury received a copy of the Presentence

4    Investigation Report, Mr. Murphy [sic]?

5          MR. DRATEL:  Yes, we have all received it.  Thank

6    you.

7          THE COURT:  And read and discussed the documents;

8    is that correct?

9          MR. DRATEL:  Yes, Your Honor.

10          THE COURT:  Okay.  I've received letters of

11    support and documents that are addressing the effect of

12    Mr. Albury's criminal activity.  I just want counsel to know

13    that I have considered those submissions carefully.  I'm

14    grateful for them.

15          And before addressing any objections, I want to

16    ask about these documents which are currently sealed.  Under

17    Local Rule 49.1(c)(2), certain documents will be

18    automatically unsealed when judgment is entered unless I

19    order otherwise and these documents include letters that are

20    submitted in connection with the sentencing hearing.

21          Does either party move to keep these materials

22    sealed?

23          MR. DRATEL:  Your Honor, with respect to some of

24    what we submitted, we submitted redacted versions that we

25    did post on ECF for personal identifying information, I

1    think which complies with other federal rules of procedure,

2    so that we do not disclose that publicly.  So we have no

3    objection to those redacted versions being unsealed, but the

4    original underlying ones that have unredacted information

5    that we redacted for that reason, we would hope that those

6    would remain sealed.

7              THE COURT:  Okay.  I will grant that motion.

8    There may need to be further communication with counsel to

9    make sure that those individuals whose names you want to

10   remain undisclosed remain undisclosed.

11             MR. DRATEL:  Thank you, Your Honor.

12             THE COURT:  Do you wish to be heard, Counsel?

13             MR. DRATEL:  Certainly, yes.

14             THE COURT:  I'm just --

15             MR. MURPHY:  No, we have no objection to that

16   process.

17             THE COURT:  Okay.  Very well.

18             MR. MURPHY:  That's perfectly fine with --

19             THE COURT:  And so we have one objection to the

20   Presentence Investigation Report and in particular

21   Mr. Albury objects to the Presentence Investigation Report's

22   application of an abuse of trust sentencing enhancement.  At

23   this time I am happy to hear argument on the objection.

24   I've also considered the arguments of counsel as to that as

25   well.

1          MR. DRATEL:  Thank you, Your Honor.  Ms. Murray is

2     going to present the argument on the enhancement.

3          THE COURT:  Thank you, Ms. Murray.

4          MS. MURRAY:  Your Honor, the two-point enhancement

5     for abuse of trust under the guidelines does not apply if

6     it's already incorporated into the defendant's offense.  We

7     submit that there are three ways in which Mr. Albury's

8     position of trust was and misuse of a position of trust was

9     already incorporated into his specific offense.

10          First of all, it was his position of trust through

11     his security clearance which granted him access to

12     classified material.  And the Eighth Circuit has said that

13     one doesn't give the two-point enhancement simply where the

14     defendant's position of trust merely gave him access to

15     commit the crime.

16          Secondly, we argue --

17          THE COURT:  What's the case you cite for that?

18          MS. MURRAY:  *Claymore*, Your Honor, *United*

19     *States v. Claymore*.

20          Second, it's central to -- the finding that his

21     handling of classified information here was unauthorized,

22     that was central to a finding of guilt under 18 U.S.C.

23     793(e).  And as Mr. Albury's factual allocution

24     acknowledged, it was only his security clearance that

25     granted him access to sensitive and classified information;

1    and what made his actions unauthorized was essentially his

2    misuse of that trust placed in him by virtue of the security

3    clearance.  So in order to actually establish the element of

4    unauthorized, it was necessary that he essentially violate a

5    position of trust with respect to the security clearance and

6    so therefore our position is that the two points is

7    effectively baked into his offense level.

8            Third, we argue that his position of trust was

9    critical to a finding that his conduct was knowing and

10   willful, and this is very clear from his factual allocution

11   as well.  The government needs to establish for a 793

12   conviction that the *mens rea* that the defendant committed

13   the act with is the knowledge that a willful communication

14   could be used to the injury of the United States.

15           And throughout the process of getting a security

16   clearance and the training that one gets in a security

17   clearance, one is advised that any release of classified

18   information could be expected to cause damage to the United

19   States.

20           So, in other words, again, the *mens rea* of this

21   offense, of Mr. Albury's offense, was baked into the concept

22   of him having a security clearance and the rules and

23   procedures of which he violated.

24           And this was actually specifically again in his

25   factual allocution in the plea agreement.  It notes in that

1   factual allocution, which was drafted by the government, in

2   particular the defendant had been advised that unauthorized

3   disclosure of secret information reasonably could be

4   expected to cause serious damage to the national security of

5   the United States and that a violation of rules governing

6   the handling of classified information could result in

7   criminal prosecution.

8         And so this is the third reason, we submit, that

9   the two-point abuse of trust from the guidelines is

10   effectively baked into Mr. Albury's offense.

11         THE COURT:  Thank you.

12         MS. MURRAY:  Thank you.

13         THE COURT:  Does the United States wish to be

14   heard?

15         MR. MURPHY:  Your Honor, the parties here agree

16   that Mr. Albury held a position of trust.  The parties agree

17   that he abused that trust.  The only disagreement is to

18   whether that matters, and of course it does.

19         THE COURT:  Well, whether it matters for

20   purposes --

21         MR. MURPHY:  Whether it matters for --

22         THE COURT:  -- of the sentencing guidelines.

23         MR. MURPHY:  Absolutely.  The courts that have

24   addressed this issue have found universally that it does.

25   The *Pitts* case involving an FBI agent, the *Ford* case

1    involving an NSA employee all upheld the enhancement.

2           The statute itself is clear that it applies to

3    whoever commits this crime, not whoever being a government

4    employee in a position of trust.  There is another statute,

5    Title 5783, that directly addresses government employees in

6    one section and foreign officials or foreign agents in

7    another section.  Here the statute is clear that it

8    addresses both.

9           And that's consistent with the statutory scheme.

10   794, the espionage statute, applies to both individuals who

11   hold or don't hold a position of trust.  793, the statute

12   here, applies to individuals who both hold and don't hold a

13   position of trust.

14          And the guidelines reflect that as well.  2M3.1 of

15   the espionage statute lays out the most severe guideline

16   penalties because of the intent level, and those guidelines

17   are driven by the classification of the information and not

18   any position.  They don't bake in anything with respect to

19   volume of material.  They don't bake in anything about

20   length of time of the crime.  They only discuss the

21   classification level.

22          And that's the same for 2M3.1, 2M3.2, and 2M3.3,

23   which is the relevant statue here -- or relevant guideline

24   provision here.  That provision only requires willful

25   transmission of materials, and willfulness is part of the

1     statute.

2            It does not matter for purposes of the guideline

3     itself if Mr. Albury were an employee in a position of trust

4     or if he were a clerk.  If he came across the materials

5     however or if he abused that trust, that is the purpose of

6     the enhancement, because he abused the trust.

7            So the fact that there haven't been a lot of

8     prosecutions of people who do not occupy a position of trust

9     is reflective of the nature of the statute here in that we

10    don't often and we haven't had any prosecutions relating to

11    the people who are receiving the material and ultimately

12    publish it because of, A, strong policy considerations,

13    respect of the First Amendment, and lack of criminal intent.

14    We go after the people who have exhibited criminal intent,

15    such as Mr. Albury.

16           In instances where hypothetically someone could

17    provide information to a relative who then used it, that

18    relative, if they met the elements of the statute for

19    willfulness, could be prosecuted.  They would be subject to

20    this guideline.  They would not be subject to an

21    enhancement.

22           The enhancement is theoretically sound, legally

23    justified, and the facts compel its application here.  Thank

24    you.

25           THE COURT:  Is there anything further to address

1    as to this matter?

2         MS. MURRAY:  Your Honor, I would just repeat that

3    the *mens rea* in Mr. Albury's case is satisfied very clearly

4    in the factual allocution with reference to his security

5    clearance, the training and advice he received with respect

6    to that.

7         And essentially the conclusion that because you

8    had a security clearance and because we told you in giving

9    it to you that any release would -- could potentially cause

10   danger or injury to the United States, that that is the

11   basis under which a *mens rea* was established in Mr. Albury's

12   case.

13        So we are not talking about other hypothetical

14   defendants.  We're talking about Mr. Albury and how the

15   *mens rea* was established in his case, and it's very clear

16   from the factual allocution it was established by virtue of

17   his violation of the security clearance requirements given

18   to him as an FBI agent.

19        THE COURT:  And what cases do you cite that are

20   the same, that are precedent for this very instance?

21        MS. MURRAY:  Your Honor, we don't have a precedent

22   where somebody's security -- we do not have a precedent

23   where somebody's security clearance procedures was the basis

24   of the *mens rea* and therefore -- and they still got a

25   two-point abuse of trust.  We just don't have a precedent.

1              THE COURT:  Okay.

2              MS. MURRAY:  Thank you.

3              MR. MURPHY:  If I could respond to that point?

4              THE COURT:  You may.

5              MR. MURPHY:  With respect to the *mens rea* element

6      here, willfulness is all that matters because it's a

7      document case.  The reason to believe could cause harm is a

8      higher intent standard that is in 2M3.2, Guideline 2M3.2.

9      Had we gone to trial, I'm confident we could have proven

10     that element and we may have been asking for that guideline

11     to be imposed here, but because this is a document case and

12     we reached a plea, we believe 2M3.3 is the appropriate

13     element.

14              And with respect to -- forget about hypothetical

15     cases.  The government has brought cases against

16     noninsiders.  The *Rosen* and *Weissman* case, which was

17     dismissed for completely different reasons, was brought.

18     They were not insiders.  Had it gone to trial and they had

19     been convicted, there's no way they would have been subject

20     to that enhancement.

21              THE COURT:  Thank you.  So I'm prepared to make my

22     ruling at this point.  Thank you, Counsel, for your

23     arguments.

24              Under Sentencing Guideline 2M3.3, the base offense

25     level for the offense that Mr. Albury has pleaded guilty to

1    is 24.   The offense level reflects that Mr. Albury, without

2    authorization, transmitted national security information to

3    a person not authorized to receive it.

4            And the parties agree that the information was not

5    top secret, which distinguishes Mr. Albury's offense level

6    24 from the higher base offense level under this guideline,

7    which would be 29 for disclosure of top secret information.

8            The offense level distinctions in the guidelines'

9    subpart 2M3 generally reflect the classification of the

10   information gathered or transmitted and this classification

11   in turn reflects the importance of the information to

12   national security.   The guideline does not distinguish

13   offense levels on the basis of the status or the

14   classification of the person who either disclosed or

15   received the information.

16           As to the abuse of trust adjustment under 3B1.1,

17   that distinguishes an offense based on the offender's role

18   or conduct in committing the offense.   And for this

19   adjustment to apply, a position of public or private trust

20   must have contributed to in some way -- or in some

21   significant way to facilitating the commission or

22   concealment of the offense.

23           Now, the base level -- offense level therefore

24   takes into account the nature of the national security

25   information disclosed; whereas, the abuse of trust

1   adjustment considers the conduct of the offender who

2   leverages a position of abuse or -- I'm sorry, a position of

3   access or authority to the commission -- in the commission

4   of the crime.

5          And as I understand Mr. Albury's argument, it is

6   that the abuse of trust position -- the abuse of his

7   position of trust is so central to the crime that it is

8   included in the base offense level.  I conclude that it is

9   not.

10          The base offense level for Mr. Albury's crime

11   reflects the nature of the information he disclosed and its

12   importance to national security.  The abuse of trust

13   adjustment reflects that he used his position as an FBI

14   agent and his security clearance to facilitate the crime in

15   a significant way.

16          As noted in Mr. Albury's position paper, the

17   commission of this particular crime would not have been

18   possible without Mr. Albury's position as an FBI agent and

19   his security clearance.  That is the very reason that the

20   abuse of trust adjustment is appropriate.

21          And so for these reasons Mr. Albury's objection to

22   the Presentence Investigation Report as to this matter is

23   overruled.

24          Are there other objections that need to be

25   addressed at this time?

1          MR. DRATEL:  No, Your Honor.

2          MR. MURPHY:  Nothing, Your Honor.

3          THE COURT:  So I adopt as the findings of this

4    Court all of the factual statements in the Presentence

5    Investigation Report to which there has been no objection.

6          Now, is the government, Mr. Murphy, moving for an

7    additional one-level reduction in the offense level for

8    acceptance of responsibility under Section 3E1.1(b) of the

9    guidelines?

10         MR. MURPHY:  That is correct, Your Honor.  A

11   timely plea was entered and we are satisfied with that.

12         THE COURT:  Thank you.  That motion is granted,

13   then.

14         And based on my rulings and that motion, I

15   determine the guidelines calculations as follows:  The total

16   offense level is 23.  The Criminal History Category is I.

17   The imprisonment range is 46 to 57 months, a supervised

18   release range of one to three years, a fine range of 20,000

19   to 200,000 dollars, and a special assessment of $200.

20         Does either the United States or Mr. Albury have

21   any corrections or objections to my guidelines calculations

22   in light of the findings and rulings that I've made so far?

23         MR. MURPHY:  No, Your Honor.

24         MR. DRATEL:  No, Your Honor.

25         THE COURT:  Very well.  And also am I correct that

1    neither the United States nor the defendant has moved for a

2    departure under the sentencing guidelines?  Is that correct?

3            MR. MURPHY:  That's correct, Your Honor.

4            MR. DRATEL:  Your Honor, we haven't moved for a

5    departure because we believe that to the extent that they

6    constitute departures, they also constitute factors that the

7    Court would weigh within 3553(a) as a whole.

8            THE COURT:  Okay.  Very well.  So then let's move

9    into the allocution phase of this hearing.  Mr. Dratel, you

10   or your co-counsel may make your arguments in favor of a

11   variance at this time and say anything else on behalf of

12   Mr. Albury.

13           MR. DRATEL:  Certainly, Your Honor.  Thank you.

14   May I use the podium?

15           THE COURT:  Yes, please.

16           MR. DRATEL:  It's easier for me to follow my

17   notes.

18           THE COURT:  And it is adjustable.  You can move

19   the platform up and down, if you need to, as well as

20   adjusting the mikes.

21           MR. DRATEL:  I think that's okay.  Maybe a year

22   from now I will need it closer.  Thank you, Your Honor.

23           I won't, obviously, go into the depth of our

24   written submissions because I know the Court has considered

25   them.

1          THE COURT:  I have.

2          MR. DRATEL:  And we appreciate that.  I just want

3    to touch on some of what we consider the important aspects

4    of sentencing here for Mr. Albury.

5          Being an FBI agent was Mr. Albury's career, his

6    only job, even starting in college.  He was decorated,

7    dedicated, believed in his work.  This in many respects

8    makes this a tragic case for him in the context of what he

9    has given up and what he has lost as a result of his

10   conduct.

11         He's not a contractor who was on the job for a

12   couple of months.  This was his professional life in its

13   entirety.  Yet he faced conflicts between his daily

14   professional role and his personal internal understanding of

15   what was happening in his job and at the Bureau as a whole

16   in terms of an approach.

17         And I would ask the Court to consider for someone

18   so committed to his work and the only culture and

19   professional position that he knew, to consider the level,

20   the pervasiveness, and the persistence of what he found

21   wrong that led him to do this, that led him to give all that

22   up, that motivated him for the offense conduct.

23         Because there's no other motive for the offense

24   conduct and the government hasn't been able and can't

25   provide anything different in the sense that it's not about

1       money, it's not about career advancement.  It's really about

2       career ending.  It's not about harm of any kind.  It's not

3       about anything other than what he perceived to be important

4       in the public interest, and in that context as well the

5       government hasn't identified an articulated harm.

6              This separates this case from so many of the other

7       cases in which the government has identified, and we have

8       put many of them in our papers, but where the government

9       identifies a specific harm.  Here there's nothing like that.

10      What you have in the submission from the government is

11      really a hypothetical and a generality that doesn't provide

12      anything like you do -- like courts had in other cases.

13             And the issues that he was concerned about are

14      issues that others were concerned about.  Even the director

15      of the FBI was concerned about these issues.  And it's

16      unfortunate that it still goes on and -- but he felt

17      compelled to, again, lose everything that he had worked for

18      for 20 years almost.

19             THE COURT:  Articulate for me those issues of

20      concern that you're addressing.  I want to make sure that

21      I'm following your allocution and it is as effective --

22             MR. DRATEL:  Sure.

23             THE COURT:  -- as you want it to be.

24             MR. DRATEL:  Okay.

25             THE COURT:  So I would like you to be specific so

1    I have a better understanding and I have better insight.

2              MR. DRATEL:  Sure.

3              THE COURT:  I think you can provide that.

4              MR. DRATEL:  Sure.  There are two aspects and I

5    think that they intertwine given Mr. Albury's own personal

6    situation.

7              One is the broader counter-terrorism program that

8    targets certain communities, particularly here in

9    Minneapolis a Muslim community, but also at the same time

10   the black community.

11             And for him in the FBI to endure from the start,

12   even from the academy, and Dr. Sachs' report I think is

13   important in this respect, even from his time at the academy

14   racial animus that he repressed, suppressed, endured for a

15   considerable period of time and that -- those things were

16   going on at the same time.

17             So on the one hand you have this policy, a program

18   that is targeting communities in a way that Mr. Albury felt

19   was alienating, not effective.  He wrote the white paper.

20   His own white paper is a reflection of his disagreement with

21   that policy.  And at the same time also a very, very

22   personal element to it as to what he experienced as an

23   isolated African-American FBI agent.

24             And I don't think -- obviously the isolation had

25   its own impact.  Dr. Sachs' report, I think, is instructive

1    in that regard too.  And it's a corrosive factor, I think

2    the isolation as well, and those aspects come together very

3    toxic in this community where you have not only Muslims who

4    are black, but also foreign and all of that together was for

5    Mr. Albury just intolerable.

6         The work that he was doing, the work that his

7    colleagues were doing, the attitudes that his colleagues had

8    towards the people in the community did not help the

9    situation.

10         And ultimately his ultimate conclusion is that

11    this is counterproductive for the program that we're trying

12    to implement, which is twofold.  One is to protect the

13    community, but the other is also to enlist the community in

14    a cooperative venture with law enforcement.  That second one

15    certainly was completely undermined by the program, and

16    that's what Mr. Albury saw and that's what he reflected on

17    in his white paper.

18         So both of those, I think, are important and

19    unfortunately with respect to the racial issue, it followed

20    him his whole career.  Like I said, it started at the

21    academy and it followed him his whole career.  And I think

22    that they dovetailed in a way that compelled him to this

23    conduct.

24         And looking at Dr. Sachs' report, also -- and also

25    he attempted to reconcile all this.  He attempted to find a

1    better way.  He went to Iraq.  He moved from San Jose to

2    Minneapolis.  I think he's -- my own interpretation.  He is

3    sort of running, but he's not necessarily running away from

4    it, he's running sort of further into it.

5          And the white paper, again, was a good idea and he

6    was discouraged by what he continually saw, that he wouldn't

7    get anywhere, so he abandoned that.

8          I think the counseling that he has received since

9    this case, since the search of his house back in August of

10   '17, I think that has been extraordinarily helpful to him

11   and effective in getting him to acknowledge these things in

12   a more productive way and acknowledge sort of the impact

13   that they had on him, on his personal life, on his

14   disposition, all sorts of things that holding all that

15   inside does to a person.

16         And in terms of his career, the punishment here is

17   not just what the Court will sentence him to.  It's ongoing.

18   He has lost his career.  He is not a lawyer who after seven

19   years can come back and petition the bar for reinstatement.

20   He is not a politician who can run again after a conviction.

21   He is not an athlete who can resume the profession, a very

22   lucrative profession.  He is not in that category.  This is

23   it.  He's not going to be able to pursue this anymore.

24         And in the context of obviously specific

25   deterrence, that resolves that.  He's never going to be in a

1    position to have a security clearance, to be in law

2    enforcement, to do any of the work that he dedicated himself

3    exclusively.  This is it.  He doesn't come from another

4    discipline.  This is his discipline.

5         And so the nature of not only in the context of

6    the professional part of it, the reputational part of it,

7    but the fact that he built up a career that was outstanding

8    and now, in the context of the law enforcement community, it

9    has no meaning, it's all gone, and he'll never get that

10   back.

11        So the punishment here in terms of collateral

12   consequences, I think, is actually far more significant than

13   many others who can resume careers, who for -- there is an

14   interregnum and then they are back, you know, they have an

15   opportunity.  This is permanent.

16        I think it's also important because I know the

17   government placed a lot of emphasis and I know that courts

18   and the statute talks about general deterrence.

19   Philosophically there are a lot of issues that one could

20   raise with general deterrence, but it's not even necessary

21   here because in this -- the landscape of these cases is so

22   chaotic and inconsistent and inequitable that there is no

23   standard and that there is no message that can be sent by a

24   single case that could affect it.

25        The system is completely -- this system of

1    unauthorized disclosure and punishment and even prosecution

2    and even investigation is so unhinged from the standards

3    that we encounter as practitioners in sentencing on a daily

4    basis, that general deterrence will not -- it can't be

5    achieved in this case.

6           He's not General Petraeus, but the next person who

7    is -- maybe it will be a friend of the President and get

8    pardoned.  Maybe it will be a powerful government or law

9    enforcement official who won't get prosecuted even.  Maybe

10   it will be someone for whom leniency or extremely harsh

11   punishment serves the political purpose in a political

12   context so that they become a pawn in some other game that's

13   being played.

14          Because right now there is no message to send with

15   this case, and they're not Terry Albury.  He's the only

16   Terry Albury.  He's the only person being sentenced today.

17   He's the only person being punished today.

18          I think in terms of the statute and the way that

19   the statute is structured, in the context of general

20   deterrence, if you have two sentences, if you have two

21   possible sentences, one harsher than the other, and if the

22   court cannot reliably, relying on empirical evidence, which

23   again doesn't exist, anecdotal evidence, which really

24   doesn't exist either, but if the court cannot reliably say

25   the harsher sentence will achieve general deterrence, then

1     the court has to impose the more lenient sentence.  That's

2     the law.  That's justice.  That's fairness.

3          There's a place for compassion at sentencing and

4     Mr. Albury deserves it for his career, for his life, as a

5     human being.  I think that's all encompassed within the

6     driving clause of sentencing, which is sufficient, but not

7     greater than necessary.

8          And sentencings are obviously about the past,

9     about offense conduct, but I think they are also a lot about

10    the future, the future for the defendant, the future for the

11    community.

12         What does prison serve in that regard?  Nothing

13    for Mr. Albury.  I don't think anybody in the room or

14    anybody who has ever met him is concerned about his future

15    and that prison is somehow needed to incapacitate him or to

16    punish him.

17         And I've been doing these for almost 40 years,

18    sentences, and my impressions are that in the context of

19    trying to achieve general deterrence, something like that,

20    and even with respect to some of the other issues, that

21    sentences are like footprints in the sand and when the next

22    wave rolls in, they are erased and no one sees them anymore.

23    The only impact this will have is on Mr. Albury and his

24    family.

25         Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Now -- actually, Mr. Albury, before I impose your

3     sentence, you do have the right to address the Court as

4     well.  Is there anything you would like to say on your own

5     behalf?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  You may come forward to the podium.

8          THE DEFENDANT:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10          THE DEFENDANT:  Thank you for the opportunity to

11     address this Court.

12       (Pause)

13          THE COURT:  Take your time.

14          THE DEFENDANT:  Fresh out of college in 2001 I

15     joined the FBI with a sincere desire to serve, protect, and

16     make this world a better place.  The FBI represented the

17     best of America, strict adherence to the Constitution,

18     coupled with fairness for those that served.

19          During my 16-plus years in the Bureau, I probably

20     served along dedicated and patriotic men and women motivated

21     by the shared call of ensuring liberty and justice for all.

22     As I grew more experienced and particularly as I worked in

23     the counter-terrorism context, it was impossible to ignore

24     and minimize the detrimental aspects certain FBI policies

25     and procedures had on this country's broader national

1    security.  As a result, I sought to address these concerns

2    outside established channels.

3           Time and separation from the FBI, along with

4    counseling, has given me a perspective I never had.  I now

5    recognize there were other avenues and wish I had trusted

6    the FBI's internal process for resolving my concerns.

7           I fully accept responsibility for everything I

8    did.  This case has been devastating for my family and me.

9    I sincerely apologize to everyone I have hurt as a result of

10   my conduct, especially my family.  My utmost apologies to my

11   former colleagues in California and Minnesota and the larger

12   law enforcement community.  I truly wanted to make a

13   difference and never intended to put anyone in danger.

14          Thank you.

15          THE COURT:  Thank you, Mr. Albury.

16          Mr. Murphy.

17          MR. MURPHY:  Your Honor, I would like to just

18   address several of the points that counsel made that I think

19   warrant being addressed.

20          He mentioned the Petraeus case.  That case was a

21   misdemeanor.  The disclosures, to the extent there were

22   disclosures in that case, were to someone with a security

23   clearance.  That's why that case was not charged as a

24   disclosure case.  It was a misdemeanor case.  That is why it

25   received misdemeanor treatment.

1          The assertion that cases get prosecuted for

2     political reasons is vastly incorrect and mildly offensive.

3     I have been doing these cases, leak cases, for ten years and

4     we go where the facts take us and we prosecute those who can

5     be prosecuted.  They are difficult cases, but I have never

6     once been politically pressured to go somewhere the facts

7     didn't warrant.  And that's all I want to say on that point.

8          With respect to the fact that Mr. Albury had a

9     long career, I think it bears noting that 10 percent of that

10    time was spent committing felonies, 10 percent of his career

11    was the course of conduct, which was only interrupted by

12    virtue of the FBI's investigation, an investigation they

13    didn't want to have to do.

14         With respect to the conflicts that Mr. Albury

15    felt, I have no doubt that they were genuine, but he could

16    have worked within the system, he could have left the

17    system.  Instead he chose to commit crimes and he continued

18    to over an 18-month span.

19         The principles that he is concerned about, defense

20    counsel himself stated that the head of the FBI himself

21    agrees with those principles.  These are not -- it's not in

22    dissonance with what the FBI is seeking to do.

23         He did not disclose any waste, fraud, or abuse.

24    He just recklessly, willfully, and criminally put

25    information in the public domain and, in addition, took

1  additional information home that would have been in the

2  public domain had we not interrupted him.  That additional

3  information completely shatters any concept of whistleblower

4  in this case.

5          The defense has been referring in their papers to

6  every single leak prosecution as a whistleblower case.  They

7  are manifestly not.  We prosecute the cases that warrant

8  prosecution.

9          With respect to the fact that he's sought

10  counseling and there's some, in their papers, reference to

11  medical jargon and analyses of issues he's faced, again, all

12  I can say on that is he could have left the FBI at any time.

13          This is a gentleman who if he was, in fact, having

14  such mental issues while he was working, this is a man who

15  loaded his weapon and carried it to work every day.  He

16  should have walked away.  He owed it to everyone to walk

17  away.  Instead he did not and he chose to commit crimes.

18          With respect to general deterrence and the scope

19  of cases that involve 11(c)(1)(C) pleas, often the

20  government resolves cases on those grounds because of the

21  information involved and the fact that we do not want to

22  cause additional harm through a prosecution.

23          That is a major problem with these cases that the

24  government has to face.  We have to weigh exposure of

25  additional or confirmation of intelligence equities that are

1      out in the world versus seeking justice.

2             Sometimes, like in this case, we have so much

3      criminal conduct to choose from that the government could

4      have gone to trial very easily.  Sometimes the nature of the

5      information, the nature of the sources at risk is such that

6      the government has to take what it can get.

7             The assertion that the government has identified

8      specific harms in other cases I take a little bit of issue

9      with because we have not -- that is why we do these cases

10     the way we do them.  We are not identifying specific harms.

11     We are not confirming particular sources and methods.

12     Sometimes we have to when cases go to trial, which they

13     rarely do.  Sometimes we have to as cases proceed.

14             But the government -- the reason we submitted the

15     declaration of Assistant Director Priestap is because the

16     harm is associated with the nature of the materials and the

17     classification system that is laid out in executive orders

18     that is followed by intelligence professionals addresses the

19     type of harm that reasonably could be associated with the

20     disclosures, and that is the sort of training Mr. Albury

21     had.  That is why, had we gone to trial, we probably could

22     have shown an additional intent level.

23             But I want to take out the notion that other cases

24     involved dramatic harm and this one involved nothing.  This

25     case involved -- even the materials that weren't disclosed,

1     the multiple victim agencies, and there were multiple

2     agencies, had to take steps.

3          He put materials on his laptop.  That laptop was

4     accessible by the Internet.  That information could be

5     anywhere.  They have to act as though it is.  They have to

6     take defensive measures.  Their programs that are in place

7     have to be readdressed, have to be revamped.  This takes

8     people away from doing their job of protecting us.

9          The defense doesn't even really address the

10    retention aspect of this crime and they sort of pass over it

11    in their papers, but it is a continuing course of conduct.

12    Those materials would have been placed, and to believe they

13    would not have been is impossible.  They would have gone out

14    the door, they would be on the Internet, and then we would

15    be in an even worse posture from a larger governmental

16    perspective in addressing the problems.  But they're bad

17    enough as is and that's why retention cases themselves get

18    real sentences.

19         So the deterrence effect here I think is very

20    important.  I think it's very important to send a guideline

21    message to people that if the government has the opportunity

22    in a case where you are doing criminal activity to actually

23    charge you and bring you to justice, you will face an

24    appropriate sentence and the government need not always take

25    a substantial haircut just because your crime is that bad.

1              That's all I have.

2              THE COURT:  Thank you.

3              MR. DRATEL:  May I respond just briefly, Your

4      Honor?

5              THE COURT:  You may.

6              MR. DRATEL:  Thank you.  I think the government

7      has undermined its own general deterrence argument because

8      in some respects it sounds like what the government is

9      saying is when its hand is forced by more important or more

10     sensitive information, it has to give lower sentences.  So

11     in that context, what is general deterrence in that regard?

12             The other part is the government wants the Court

13     to sentence Mr. Albury on the basis of something that never

14     happened, which is dissemination of the retained documents.

15     The government wants the Court to essentially sentence him

16     on a hypothetical.

17             Some of those documents he had for four or five

18     months.  We don't know what would have happened.  I'm not

19     saying one way or the other, but I'm saying that none of

20     them were disseminated and he had some of them from April

21     and May, for three to four months.

22             So I think it would not be appropriate to -- I

23     think the government's argument is inappropriate in the

24     sense that the crime is the crime, not something that never

25     happened.

1          Thank you.

2          THE COURT:  Do the guidelines themselves, however,

3     address the issue of the offense that was committed in this

4     case?

5          MR. DRATEL:  Retention has -- yeah, so in that

6     sense it's incorporated within the guideline.  There's no

7     other aspect of it that should enhance or increase the

8     sentence in any way.  But what I'm saying is that in the

9     context of what the government wants the Court to consider

10    is something that simply did not happen.

11         THE COURT:  Okay.

12         MR. DRATEL:  Thank you, Your Honor.

13         MR. MURPHY:  Your Honor, if I could address that

14    last point?

15         THE COURT:  You may.

16         MR. MURPHY:  Something that did not happen did

17    happen.  He took the documents home, willfully retained

18    them.  That itself is a felony.  If they want to treat that

19    as an entirely separate crime that does not matter, that is

20    wholly inappropriate.  It is all part of one or continuing

21    course of conduct.

22         Not only did he take the documents home, he had

23    the reporter's phone number attached to them, the same

24    reporter to whom he disclosed information previously.  So

25    they were going to go.

1              But if we are going to treat it as a completely

2       separate offense, then we should be talking about how they

3       don't group and they should be sentenced differently.  There

4       would be, I believe, another two levels associated if it

5       were a completely different crime.

6              So I do not understand the defense ignoring the

7       facts of this case, especially in connection with a guilty

8       plea.  I do not think ignoring the facts helps them and it

9       completely undermines, within the 3553 factors, true

10      acceptance.

11             So if there are any other questions from the

12      Court, I would be happy to address them, but I think I've

13      had my say.

14             THE COURT:  Very well.

15         (Pause)

16             THE COURT:  Mr. Albury and your counsel, please

17      come forward.  I am prepared to render a sentence in this

18      matter.

19             I have carefully reviewed the Presentence

20      Investigation Report and the addendum to the report.  I'm

21      now prepared to impose the sentence.  I've listened

22      carefully to the arguments that have been made here today.

23      I have thoroughly reviewed the position papers of the

24      parties, the briefing of the parties, and I've reviewed the

25      documents that are the subject of this crime.

1              And it is the judgment of the Court that you,

2       Terry J. Albury, are sentenced to prison for a term of

3       48 months.

4              No fine is imposed.

5              You must pay a special assessment in the amount of

6       $200 to the United States and that is due immediately.

7              You're ordered to serve a term of supervised

8       release and on release from your imprisonment, that

9       supervised release term will be three years.  While on

10      supervised release you must comply with the following

11      conditions:

12             You must comply with the mandatory conditions of

13      supervised release that's described in Section 5D1.3(a) of

14      the United States Sentencing Guidelines and these conditions

15      include:

16             That you must not commit any crimes, federal,

17      state, or local.

18             You must not unlawfully possess a controlled

19      substance.  You must refrain from any unlawful use of a

20      controlled substance.  You must submit to one drug test

21      within 15 days after your release from imprisonment and at

22      least two periodic drug tests thereafter as determined by

23      your probation officer.

24             You must cooperate in the collection of a DNA

25      sample as directed by Probation.

1              You also must comply with the standard conditions

2      of supervised release described in Section 5D1.3(c) of the

3      sentencing guidelines.  These conditions include:

4              That you must report to the nearest United States

5      Probation and Pretrial Services Office within 78 [sic] hours

6      after your release from prison, unless the probation officer

7      instructs you otherwise.

8              You must not possess a firearm, ammunition,

9      destructive device, or any other dangerous weapon.

10             You're also ordered to abide by the following

11     special conditions of your supervised release:

12             You must abstain from the use of alcohol and other

13     intoxicants and not frequent establishments whose primary

14     business is the sale of alcoholic beverages.

15             You must submit to substance abuse testing as

16     approved and directed by your probation officer.

17             You must participate in psychological or

18     psychiatric counseling or treatment program as approved by

19     your probation officer.  Further, you must contribute to the

20     costs of that treatment as determined by the Probation

21     Office Co-Payment Program, not to exceed the total cost of

22     treatment.

23             And I direct that the Probation Office furnish you

24     a written statement of all of the conditions of your

25     supervised release.

1          At this time I'll ask, Mr. Dratel, if there is a

2    particular location of incarceration that you wish to

3    request.

4          MR. DRATEL:  May we get back to the Court within a

5    couple of days in writing on that?  Just because now we have

6    a better idea of what's -- what the amount is and all of

7    that.

8          THE COURT:  Yes, you may.

9          MR. DRATEL:  Thank you, Your Honor.

10         THE COURT:  I want to explain the reasons now for

11   the sentence that I have imposed.

12         Having considered all of the Section 3553(a)

13   factors, I find that the sentence that I've imposed is

14   sufficient, but it's not greater than necessary to reflect

15   the seriousness of Mr. Albury's offense and to provide just

16   punishment for that crime, to deter Mr. Albury from

17   committing crimes in the future, to deter others from

18   committing this crime or similar crimes in the future, to

19   protect the public, to provide Mr. Albury with needed

20   treatment and counseling, and to avoid unwarranted

21   disparities between Mr. Albury's sentence and the sentences

22   of defendants who have similar records who have been found

23   guilty of similar conduct.

24         I have sentenced Mr. Albury to 48 months in prison

25   and this sentence in my judgment is appropriately tailored

1        to the facts and the circumstances here.

2               Mr. Albury, over a period of 18 months you used

3        your position as an FBI agent and your security clearance to

4        collect sensitive information related to national security,

5        which you later released to a reporter.  You did so

6        knowingly.  You did so willfully.  You knew what you were

7        doing was a criminal act and you knew that you were putting

8        the nation's security at risk.

9               Let no one be mistaken this is a very serious

10       offense.  Although your crime may not bring any identifiable

11       victims here into the courtroom today, we cannot ignore the

12       purpose of our vast security -- national security

13       infrastructure.  That is to protect and defend the United

14       States.  And you put that infrastructure at risk.  You put

15       the United States at risk.

16              Now, it may be in your mind that it was a minimal

17       risk or it may be in your mind a just calculation of risk.

18       That's your judgment.  The law stands in judgment of the

19       acts that you committed.

20              I am mindful of the circumstances surrounding your

21       career in the FBI and what may have motivated your criminal

22       conduct.  I think that's an important consideration.  I'm

23       not blind to the racism that exists in our society.  It has

24       been in the making for over hundreds of years and as valiant

25       as the efforts are to eliminate it, I dare say it will be a

1     part of our future for quite some time.

2          I'm not blind to what it means to be a discrete

3     and insular minority, particularly in a professional

4     environment, but those conditions, they didn't require you

5     to commit a crime and in my view they are not a valid excuse

6     for doing so.

7          You had other options, but you chose the one that

8     you chose.  It brings you here into this courtroom today.

9     In fact, in light of your exemplary record, you very well

10    may have squandered the opportunity to shed light on

11    conditions that concerned you in a manner that could have

12    resulted in a productive response.  You chose a different

13    path and that path leads you right here.

14         I have reviewed your personal history, your

15    family's history, and your personal experiences that have

16    instilled strong convictions in you, your college

17    experience, your experience excelling in school before

18    college, the investment of people in the community in you,

19    the hopes and dreams that you took not only to college, but

20    into society, into law enforcement with the hopes and dreams

21    of people who have known oppression, who have known

22    brutality, and who thought your presence would shape law

23    enforcement in a way that could help change policy, help

24    bring about the sustained justice and safety that so many

25    members of our community, regardless of race, hope for.

1          And at some point, and maybe still, you perceived

2     your actions to be honorable.  Maybe that was your

3     motivation, but it is a misguided understanding of honor.

4     It put our country at risk.

5          Honor is shown even in the midst of this

6     devastating circumstance, however, by your acceptance of

7     responsibility for this offense immediately upon its

8     discovery.  You admit your wrongdoing now and the danger to

9     which you exposed your country, our country, your family's

10    country, your children's country.

11         Your conduct was not motivated by greed and you

12    have indicated that you were motivated by sincere moral

13    conflict.  The moral conflict is not one that you're being

14    judged on today.  It's not what the sentence represents a

15    response to.  It's not the conflict.  It's the exercise of

16    bad judgment and criminal activity in response, and that

17    cannot be tolerated.

18         The United States' security cannot be put at risk

19    for that purpose and it's hard for me to believe that you,

20    with your intelligence, your training in law enforcement,

21    your experience as an FBI agent, that you didn't understand

22    the risk that you were taking in putting the United States

23    in harm's way by acting in the manner that you did, in your

24    mind for a noble cause and a just action, in the minds of

25    those who understand national security a fool's errand, one

1    that you went on I believe with sincere hopes of doing the

2    right thing, but a real, real misguided understanding of

3    justice and a misguided exercise of judgment.  You knew

4    better then.

5           It's not too late for you to move forward with

6    your life, certainly without the opportunity to serve, as

7    you so proudly served at one point in your career, certainly

8    not as a person that can be trusted and entrusted with the

9    nation's security or the security of American people or any

10   of our institutions because of the judgment that you

11   exercised and have displayed.

12          It's too late to undo the damage from the

13   decisions you made.  It's not too late to move forward with

14   an understanding of the wrongdoing, with the understanding

15   of the implications, and perhaps with a more productive

16   effort to right the wrongs that you identified in terms of

17   racism and perhaps with the wrongs that you identified in

18   selective punishment.

19          It's up to you to decide whether that is your

20   mission that you wish to address in a lawful manner.  No one

21   will make you.  Frankly, no one will blame you for saying

22   enough.

23          But let it be clear that we are a nation of laws.

24   We challenge unjust laws in places like this, United States

25   courts.  We do so with the laws that exist in the United

1    States and the Constitution.  We do not do so in the manner

2    in which you did or you thought you did and not, first of

3    all, place America in harm's way and, secondly, creating an

4    example that is not one that should be followed.

5           You've been a role model and, frankly, you can

6    still be a role model with the proper understanding and

7    rehabilitation for the crimes that you have committed, but

8    that's you -- that's on you.  It's your decision.  That's

9    not a part of your sentence.  You will be punished for the

10   acts that you committed.  What you decide to do with the

11   lessons learned and how you affect society in the future

12   will be your decision.

13          You can do good in this world again, but it will

14   be your decision whether that's a commitment you want to

15   make.  And no one is going to blame you if that's not what

16   you want to do, but it certainly may be the opportunity to

17   think about some type of redress that may impact others

18   facing similar challenges and who are thinking about

19   committing the same mistakes that you have committed,

20   helping them understand the nature of those mistakes and

21   helping them understand why a different path would be a

22   better one.

23          The materials that I have read about you describe

24   you as a man of character.  You have skills, you have

25   talent, you have personality traits that make you an asset

1       to your family that can help you replenish your worth to

2       this community.  I believe that you have them.  I would not

3       mention them now if I didn't believe that they exist.  And

4       they have not been destroyed and they aren't diminished by

5       the actions that you have taken.

6               I encourage you to maintain and develop your

7       abilities both during the time you spend in prison and the

8       time after your release.  There will be opportunities

9       available to you while serving your sentence.  Given your

10      professional and personal background, I'm confident that

11      you'll take advantage of those opportunities.  And certainly

12      upon your release there will be opportunities as well, but

13      it's up to you.  That's not a part of your sentence.  That's

14      how you decide to move forward and it's a very personal

15      decision, one that you make with your family, one that helps

16      make you whole.  We don't have enough people to squander,

17      people of your talent, people of your intellect, so I hope

18      that you use those skills in a productive way going forward.

19              I have imposed a three-year term of supervised

20      release to monitor and to support your transition back to

21      the community.

22              I want you to understand you have the right to

23      appeal your conviction if you believe your guilty plea was

24      unlawful or invalid.  And in general a defendant has the

25      right to appeal his sentence, but as part of your plea

1    agreement you gave up your right to appeal the length of

2    your sentence as I have imposed it.

3           And courts usually enforce this type of waiver,

4    but if you believe that regardless of your plea agreement

5    you still have the right to appeal your sentence, you should

6    do so and you should make your arguments to the United

7    States Court of Appeals for the Eighth Circuit.

8           Now, if you wish to appeal your conviction, your

9    sentence or both, you must file a Notice of Appeal within

10   14 days after the entry of the judgment of conviction in

11   this case.

12          If you cannot afford to pay the costs of an

13   appeal, you can ask for permission to be excused from paying

14   those costs and if you make that request, the Clerk of Court

15   will file a Notice of Appeal on your behalf.

16          The Presentence Investigation Report will be kept

17   in the Court's files under seal and if an appeal is filed,

18   the report will be delivered to the United States Court of

19   Appeals for the Eighth Circuit.

20          Mr. Albury is not currently in custody and the

21   Mandatory Detention Act does not apply.

22          Mr. Albury, you must self-surrender to the United

23   States Marshal Service at 10:00 a.m. on November 8, 2018.

24   And the conditions of your release that have previously been

25   ordered remain in effect.

1          Counsel, is there anything further that the Court

2     needs to address in this matter at this time?

3          MR. DRATEL:  Yes, Your Honor.  We would ask that

4     Mr. Albury's surrender be postponed until he's designated.

5     It makes a difference in terms of classification.

6          THE COURT:  I didn't --

7          MR. DRATEL:  Sorry.  We would ask that

8     Mr. Albury's surrender be deferred until he is actually

9     designated by the Bureau of Prisons.  It makes a big

10    difference in terms of placement and classification.

11    Self-surrender to a designated facility is an important

12    aspect of this, so we would ask that he be -- that process

13    in my experience is between 45 and 60 days.  So I would ask

14    that it be at the time of designation, you know, that we

15    could work that out with the Bureau of Prisons and do that.

16          THE COURT:  I am going to ask if the United

17    States -- Mr. Murphy, do you wish to be heard on that

18    matter?

19          MR. MURPHY:  Your Honor, we do not have a position

20    on this.

21          THE COURT:  Then that motion is granted and it is

22    so ordered.  I do need to have a self-surrender date at some

23    point and so I will consult with counsel to make the

24    determination as to when that self-surrender date is --

25          MR. DRATEL:  Yes.

1       THE COURT:  -- and how to make sure that a court

2    order reflects that so that we are sure that there is ample

3    notice for Mr. Albury and so that his rights are preserved

4    and so that there aren't any questions of due process should

5    there be a failure to appear.

6       MR. DRATEL:  Your Honor, what we'll do is when we

7    send you the letter with respect to designation, we'll set

8    forth a schedule that we think makes sense based on

9    experience with the Bureau of Prisons.

10       THE COURT:  Very well.  And I will then at that

11    point set a date and time by order.

12       MR. DRATEL:  Thank you, Your Honor.

13       THE COURT:  Is there anything further, Counsel,

14    that the Court needs to address in this matter at this time?

15       MR. DRATEL:  No, Your Honor.

16       MS. MURRAY:  No, Your Honor.

17       MR. MURPHY:  No, Your Honor.

18       THE COURT:  Mr. Albury, good luck to you.

19    (Court adjourned at 12:29 p.m.)

20                        *     *     *

21

22

23

24

25

1

2

3          I, Lori A. Simpson, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7               Certified by:  *s/ Lori A. Simpson*

8                              Lori A. Simpson, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25